UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

| | |
|---|---|
| WESTPORT INVESTMENTS, LLC, a Washington limited liability company; LANCO, LLC, a Washington limited liability company,<br><br>Plaintiffs,<br><br>v.<br><br>KEMPER SPORTS MANAGEMENT, INC., an Illinois corporation,<br><br>Defendant. | CASE NO. C07-5417BHS<br><br>ORDER DENYING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT AND STRIKING PLAINTIFFS' CROSS-MOTION FOR SUMMARY JUDGMENT |

This matter comes before the Court on Defendant's Motion for Summary Judgment (Dkt. 37) and Plaintiffs' Cross-Motion for Summary Judgment (Dkt. 45). The Court has considered the pleadings filed in support of and in opposition to the motions and the remainder of the file and hereby denies Defendant's motion and strikes Plaintiffs' motion for the reasons stated herein.

**I. PROCEDURAL BACKGROUND**

On November 28, 2007, the Court ordered that two actions were to be consolidated and merged to form this action. Dkt. 13 (consolidating and merging *Westport Investment, LLC v. Kemper Sports Management, Inc.*, C07-5417BHS, and *Kemper Sports Management, Inc. v. Westport Investment, LLC*, C07-5468BHS). On December 11, 2007, Plaintiffs Westport Investments, LLC ("Westport"), and Lanco, LLC, filed an amended complaint against Defendant Kemper Sports Management, Inc. ("Kemper"), alleging that Defendant breached two contracts: (1) a Management Agreement between Westport and

ORDER - 1

1  Defendant and (2) a Construction Develop Management Agreement between Lanco and
2  Defendant. Dkt. 14. On December 28, 2007, Defendant answered the complaint and
3  asserted a counterclaim of breach of contract against Westport. Dkt. 15.

4  On March 4, 2008, the Court issued a scheduling order that set October 28, 2008
5  as the deadline for filing dispositive motions. Dkt. 21.

6  On October 27, 2008, Defendant filed a Motion for Summary Judgment. Dkt. 37.
7  On November 17, 2008, Plaintiffs responded and included a Cross-Motion for Summary
8  Judgment. Dkt. 45. On November 19, 2008, Defendant filed a Motion to Strike
9  Plaintiffs' Cross-Motion for Summary Judgment. Dkt. 58. On November 21, 2008,
10 Defendant replied and included a Motion to Strike Plaintiffs' Inadmissible Evidence.
11 Dkt. 60.

## II. FACTUAL BACKGROUND

**A.  The Management Agreement**

On January 10, 2006, Westport and Kemper entered into a Management Agreement. Dkts. 40-2 (part 1) and 40-3 (part 2). Westport was the lessee of certain properties in and around Westport, Washington and conducted restaurant and lodging businesses at those properties. Dkt. 40-2 at 1. Westport contracted with Kemper to manage those businesses according to the terms and the conditions of the Management Agreement. *Id.*

Article 11 of the Management Agreement states that the "Events of Default" are failure to pay sums due, failure to comply with covenants, bankruptcy, reorganization or appointment of receiver, and a failure to maintain insurance. *Id.*, Arts. 11.1 - 11.5. If a party fails to comply with the covenants of the agreement, the other party must provide a written notice of default:

> Either party's failure to comply with any of the covenants, agreements, terms, or conditions contained in this Agreement and such failure shall continue for a period of thirty (30) days after written notice thereof from the other party to the defaulting party specifying in detail the nature of such failure.

*Id.*, Art. 11.2. The agreement provides how notice must be communicated as follows:

> Any notices or other communications required or permitted hereunder shall be sufficiently given if in writing and (i) delivered personally, (ii) sent by certified mail, return receipt requested, postage prepaid ("Mail"), or (iii) sent by nationally recognized overnight mail or courier service ("Overnight Courier"), addressed as shown below, or to such other address as the party concerned may substitute by written notice to the other . . . .

*Id.*, Art. 14.

## B. The Construction Development Management Agreement

On June 14, 2006, Lanco and Kemper entered into a Construction Development Management Agreement ("Development Agreement"). Dkt. 40.4. Lanco was the owner of two golf properties called Highlands and the Links that were located in Aberdeen, Washington and Westport, Washington, respectively. *Id.* at 1. Lanco proposed to renovate, develop, design and construct certain golf club, residential facilities, and improvements on the golf properties. *Id.* Lanco contracted with Kemper to plan and manage the construction and development of those properties. *Id.* Chuck Maples signed the Development Agreement on behalf of Lanco. *Id.* at 27.

Article 10.1 of the Development Agreement states that the "Events of Default" are failure to pay sums due, failure to comply with covenants, bankruptcy, reorganization or appointment of receiver, and a failure to maintain insurance. *Id.*, Arts. 10.1.1 - 10.1.5. If a party fails to comply with the covenants of the agreement, the other party must provide a written notice of default:

> Either party's failure to comply with any of the covenants, agreements, terms, or conditions contained in this Agreement and such failure shall continue for a period of thirty (30) days after written notice thereof from the other party to the defaulting party specifying in detail the nature of such failure.

*Id.*, Art. 10.1.2. The agreement provides how notice must be given as follows:

> Any notices or other communications required or permitted hereunder shall be sufficiently given if in writing and (i) delivered personally, (ii) sent by certified mail, return receipt requested, postage prepaid ("Mail"), or (iii) sent by nationally recognized overnight mail or courier service ("Overnight Courier"), addressed as shown below, or to

<pre>
                such other address as the party concerned may substitute by written notice
                to the other . . . .
</pre>

*Id.*, Art. 12.1.

## C.     Amendments to the Agreements

Almost immediately after the parties entered into the aforementioned agreements, both relationships began to deteriorate. The tense business relationships led to alleged non-performance of the contracts and alleged verbal and written amendments to the contracts that were entered into by party representatives. Chuck Maples claims that he is the managing partner of both Westport and Lanco. Dkt. 46, Declaration of Chuck Maples ("Maples Decl."), ¶ 2. On the other hand, Toby Davis claims that he "was the primary contact between [Kemper] and both Westport and Lanco." Dkt. 39, Declaration of Toby Davis ("Davis Decl."), ¶ 6. Mr. Davis also claims that in his "dealings with Westport and Lanco [he] primarily dealt directly with Mr. Maples or his daughter Brook Maples." *Id*.

Mr. Maples claims that Defendant "failed to perform what [it] had promised under both contracts" and "under [Defendant's] management [Plaintiffs] lost over a million dollars." Maples Decl., ¶ 4. As a result, Mr. Maples and his daughter sent Defendant numerous emails that notified Defendant of its failure of performance of the contracts and "threatened to terminate the relationship if things weren't fixed." *Id*. ¶ 5. Mr. Davis confirms these allegations of contract termination by claiming that "[b]eginning in the summer of 2006, in e-mail communications, [Mr. Maples] and [Brook Maples] sought to terminate both [agreements]." Davis Decl., ¶ 7.

It is undisputed that in late October of 2006 Mr. Maples and Mr. Davis discussed both agreements over the telephone. Maples Decl., ¶ 6; Davis Decl., ¶ 18. Mr. Davis claims that, in that conversation, they "verbally agreed" to various amendments to the agreements. Davis Decl., ¶ 18. On October 27, 2008, Mr. Maples sent Mr. Davis an e-mail that reads, in part, as follows:

[W]e propose the following changes to our contractual relationship:

1. All business operations presently managed by Kemper and owned by Maples are transferred back to Westport Investments LLC as of Close of Business, Sunday, October 29, 2006.
2. Kemper continues to assist Maples on the development of the two golf courses, Coyote Ridge and the Links at Halfmoon Bay. The contractual relationship between Kemper and Lanco will be rewritten to reflect a pre development consulting agreement with an actual construction and operations management agreement once the projects move forward with Mox Chehalis, LLC for the Links at Half Moon Bay and with Coyote Ridge Properties, LLC for Coyote Ridge Golf Course, (both signed by Chuck Maples) for $10,000/month (collectively), effective October 30, 2006. Any other miscellaneous Kemper invoices will be paid to date upon review and approval from both Kemper and Maples. The oversight on the previous agreements was assuming they would absolutely be built and there should be language to unwind if they don't happen. We believe they are imminent and will begin in the next 30 to 60 days but our ability to move forward is dependent on external forces outside of our control such as entitlement, appeals, financing etc. and history has told us that it isn't done until it is done.
3. All licenses and permits are transferred as soon as possible back to Westport Investments LLC.
4. Kemper terminates all employees and stops incurring payroll costs as of Sunday October 29th. Westport Investments LLC will not hire back any key employees of Kemper.
5. Westport Investments will stop serving liquor as of Sunday, October 29th until license is put back into Westport Investments, LLC name or authority from the liquor board is received by Westport Investments.

Davis Decl., Exh. 8 at 1.

In response, Mr. Davis sent Mr. Maples a document in regard to the "Operations Management Agreement Amendment," which reads, in part, as follows:

I offer the following for your review:
1. The management contract will remain in effect and will be amended per the business points noted below. Once the parties agree to the business points outlined below, a legal amendment will be drafted for each party's review and signature. The parties will work in good faith to have this amendment completed by the end of the business day on Monday, October 30.
2. All business operations presently managed by Kemper and owned by Maples will be transferred back to Westport Investments LLC as of close of business, Monday, October 30, 2006 and the signing of the amendment.
3. All licenses and permits are transferred as soon as possible back to Westport Investments. Westport will stop servicing [sic] liquor on Monday, October 30 until the license is back in Westport name or authority from the liquor board is received by Westport.
4. Kemper will terminate all employees and stop incurring payroll costs as of Monday October 30th. Westport Investments LLC can rehire any current key employees at its discretion. Kemper will not hire any new employees from this point forward including George and Kim who are currently not on the Kemper payroll.

ORDER - 5

> 5. Westport will pay Kemper the $10,000 base management fee through the end of October, the past due CM bill, any outstanding travel reimbursements, and payroll and benefits, etc. Kemper will forego the remainder of the base management (i.e. the 5% of gross less the sum of the $10,000 base payments).
> 6. In lieu of paying the early termination fee, Westport will pay Kemper $10,000 per month for 36 months starting November 1, 2006. The payments made would be credited against the early termination payment outlined in the contract. A default in this payment stream would trigger an acceleration of the remaining amounts owed on the termination fee.
> 7. Kemper will consult with Westport starting November 1, 2006 on the Links and Coyote Ridge golf courses. Westport will reimburse Kemper for any travel and other out of pocket expenses associated with this consulting provision.
> 8. The construction management and operations management contracts will remain in effect for the golf course and related resort properties only unless the parties agree to include other business. Language will be drafted to provide a termination of these construction management and operations management contracts in the event that . . . the golf courses and related resort properties are not built by entities owned or affiliated with you.
> Upon agreement, Kemper Sports will initiate a legal amendment for your review.

*Id.*, Exh. 9 at 2-3 ("October 27, 2006 Document"). Mr. Maples signed the document (*id.* at 3) and Brook Maples faxed the signed document to Defendant (*id.* at 1). Mr. Davis claims that this document is an amendment to the agreements (Davis Decl., ¶¶ 23-25), whereas Mr. Maples claims that it is a letter of intent to negotiate and subsequently enter into a legally binding amendment (Maples Decl., ¶ 11).

On October 30, 2008, Mr. Davis sent Mr. Maples a document entitled "First Amendment to Management Agreement." Maples Decl., ¶¶ 52-55. It is undisputed that the parties did not sign this document.

On November 3, 2006, Kemper's Chief Financial Officer, Gregory Myles, claims that he requested his staff to send an invoice for $10,000 to Westport. Dkt. 41, Declaration of Gregory Myers ("Myers Decl.") ¶ 4; *id.* Exh. 2. That invoice states "Consulting Fee per Amendment to Contract – $10,000." *Id.* Mr. Myers claims that Westport paid the invoice by check dated November 10, 2006. Myers Decl., ¶¶ 5-6. That check, however, appears to be from Coyote Ridge Properties, LLC. *See id.* Exh. 2.

ORDER - 6

1 | Mr. Davis claims that it performed obligations under the alleged amendment.
2 | Davis Decl., ¶ 27. Moreover, Mr. Davis claims that, on multiple occasions, both Mr.
3 | Maples and Brook Maples formally acknowledged that the October 27, 2006 Document
4 | was an amendment to the Managing Agreement. *Id*. ¶¶ 28-30. Mr. Maples, however,
5 | claims that the October 27, 2006 Document does not "amend[] the contract at all."
6 | Maples Decl., ¶ 14.

## III. DISCUSSION

### A.  Motion to Strike Plaintiffs' Cross-Motion for Summary Judgment

Defendant argues that "Plaintiffs failed to timely file a dispositive motion." Dkt. 58 at 1. The Court set October 28, 2008 as the deadline for the filing of dispositive motions. Dkt. 21. Plaintiffs filed their motion for summary judgment on November 17, 2008. Dkt. 45. Once the Court sets the pretrial schedule, it "may be modified only for good cause and with the judge's consent." Fed. R. Civ. P. 16(b)(4). Plaintiffs have neither shown good cause for their tardy motion nor obtained the Court's consent for the tardy motion. Therefore, the Court grants Defendant's motion and Plaintiffs' Cross-Motion for Summary Judgment (Dkt. 45) is stricken.

Plaintiffs have failed to clearly outline what portions of their brief is in opposition to Defendant's motion for summary judgment and what portions are in support of their cross-motion for summary judgment. As a result, the Court will consider Plaintiffs' arguments only as arguments in opposition to Defendant's motion for summary judgment.

### B.  Motion to Strike Plaintiffs' Inadmissible Evidence

Defendant moves to strike all of the declarations that Plaintiffs submitted in opposition to Defendant's motion for summary judgment. Dkt. 60 at 2-3. Defendant has moved to strike the declarations of Donovan Maples (Dkt. 51), Don Holmes (Dkt. 49), Kelci Williams (Dkt. 52), Johnna L. Overmyer (Dkt. 55), and Thomas Mayr (Dkt. 57) because Plaintiffs failed to disclose these witnesses during discovery. Dkt. 60 at 2.

A party must disclose "each individual likely to have discoverable information." Fed. R. Civ. P. 26 (a)(1)(A)(I). The party must also timely supplement this disclosure. *Id*. 26(e)(1). "If a party fails to provide information or identify a witness as required by Rule 26(a) or (e), the party is not allowed to use that information or witness to supply evidence on a motion . . . ." *Id*. 37(c)(1).

In their initial disclosures, Plaintiffs did not disclose Donovan Maples, Don Holmes, Kelci Williams, Johnna L. Overmyer, or Thomas Mayr. *See* Dkt. 18. There is no evidence on the record that Plaintiffs supplemented their initial disclosures by disclosing these potential sources of evidence to Defendant. Therefore, the Court grants Defendant's motion to strike these declarations because Plaintiffs have failed to comply with the Federal Rules of Civil Procedure.

Defendant also moves to strike the remainder of Plaintiffs' declarations (Dkts. 46, 50, 53, 54 and 56). Dkt. 60 at 3. Defendant argues that these "declarations are replete with irrelevant information, hearsay statements, and opinion evidence." *Id*. The declarations do contain inadmissible evidence. Therefore, the Court grants Defendant's motion to strike these declarations as to the inadmissible evidence that they contain. For the purposes of Defendant's summary judgment motion, however, the Court will specifically identify any admissible evidence in these declarations that may be used to overcome Defendant's motion.

**C.     Summary Judgment**

Defendant moves for summary judgment on its breach of contract counterclaim and on Plaintiffs' breach of contract claims. Dkt. 37 at 11 and 18.

**1.     Standard**

Summary judgment is proper only if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). The moving party is entitled to judgment as a matter of law when the nonmoving party

fails to make a sufficient showing on an essential element of a claim in the case on which the nonmoving party has the burden of proof. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1985). There is no genuine issue of fact for trial where the record, taken as a whole, could not lead a rational trier of fact to find for the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986) (nonmoving party must present specific, significant probative evidence, not simply "some metaphysical doubt"). *See also* Fed. R. Civ. P. 56(e). Conversely, a genuine dispute over a material fact exists if there is sufficient evidence supporting the claimed factual dispute, requiring a judge or jury to resolve the differing versions of the truth. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 253 (1986); *T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987).

The determination of the existence of a material fact is often a close question. The Court must consider the substantive evidentiary burden that the nonmoving party must meet at trial – e.g., a preponderance of the evidence in most civil cases. *Anderson*, 477 U.S. at 254; *T.W. Elec. Serv., Inc.*, 809 F.2d at 630. The Court must resolve any factual issues of controversy in favor of the nonmoving party only when the facts specifically attested by that party contradict facts specifically attested by the moving party. The nonmoving party may not merely state that it will discredit the moving party's evidence at trial, in the hopes that evidence can be developed at trial to support the claim. *T.W. Elec. Serv., Inc.*, 809 F.2d at 630 (relying on *Anderson, supra)*. Conclusory, nonspecific statements in affidavits are not sufficient, and missing facts will not be presumed. *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 888-89 (1990).

### 2. **Breach of Contract**

To prevail at summary judgment on a breach of contract claim, a party "must show that there are no issues of material fact as to (1) the existence of a contract, (2) a material breach of that contract, and (3) resulting damage." *Northwest Indep. Forest Mfrs. v. Dep't of Labor & Indus.*, 78 Wn. App. 707, 712 (1995).

### a. Defendant's Breach of Contract Counterclaim

Defendant presents two arguments in support of its motion for summary judgment on its counterclaim: (1) the October, 27, 2006 Document is a valid contract between the parties and (2) even if the October, 27, 2006 Document was not a valid contract when Mr. Maples signed it and Brook Maples faxed it to Defendant, it became a valid contract because Plaintiffs manifested an intent to be bound by the terms that were agreed upon in that document. Dkt. 60 at 3-8. Plaintiffs counter that the October 27, 2006 Document is a "letter of intent, an unenforceable agreement to agree." Dkt. 45 at 4.

Washington courts recognize three similar, yet legally distinct, types of agreements: (1) an agreement to agree, (2) an agreement with open terms, and (3) a contract to negotiate. *Keystone Land & Development Co. v. Xerox Corp.*, 152 Wn.2d 171, 175-76 (2004). Agreements to agree are unenforceable. *Id*. at 176. "Under an agreement with open terms, the parties intend to be bound by the key points agreed upon with the remaining terms supplied by a court or another authoritative source." *Id*. "In a contract to negotiate, the parties exchange promises to conform to a specific course of conduct during negotiations, such as negotiating in good faith, exclusively with each other, or for a specific period of time." *Id*.

First, the Court must determine whether the parties made clear that they intended to be bound by the terms contained in the October 27, 2006 Document. Under Washington contract law, if parties contemplate drafting a later agreement, this is "strong evidence to show that they do not intend the previous negotiations to amount to any proposal or acceptance." *Pacific Cascade Corp. v. Nimmer*, 25 Wn. App. 552, 556 (1980) (quoting *Coleman v. St. Paul & Tacoma Lumber Co.*, 110 Wn. 259, 272 (1920)). On the other hand,

> in determining whether informal writings such as letters are sufficient to establish a contract even though the parties contemplate signing a more formal written agreement, Washington courts consider whether (1) the subject matter has been agreed upon, (2) the terms are all stated in the informal writings, and (3) the parties intended a binding agreement prior to the time of the signing and delivery of a formal contract.

*Morris v. Maks*, 69 Wn. App. 865 (1993) (citing *Loewi v. Long*, 76 Wash. 480, 484 (1913)).

In this case, a plain reading of the October 27, 2006 Document shows that the parties agreed to "business points" for which a "legal amendment [would] be [subsequently] drafted for each party's review and signature." *See supra*. Defendant argues that even if the writing contemplated a more formal document, the writing "can nevertheless establish a contract." Dkt. 60 at 4. Defendant, however, was the party that drafted the October 27, 2006 Document and it specifically included language to the effect that the document is not intended to be legally binding on either party, including the Defendant. In other words, Defendant is requesting that the Court find that Defendant should be bound to the terms of a document that contains a specific expression of Defendant's intention not to be bound to the terms outlined in the document. Although Defendant's subsequent acts may evidence its intent to be bound to the October 27, 2006 Document, the plain language of the document does not show that Defendant intended to be bound by its terms.

As for Plaintiffs' intent to be bound to the October 27, 2006 Document, Mr. Maples claims that he "looked very carefully at the letter of intent dated October 27, [2006]" and he does not "think [that] it amends the contract at all." Maples Decl., ¶ 14. Taking this evidence in the light most favorable to Plaintiffs and assuming arguendo that Defendant intended to be bound by the October 27, 2006 Document, there exists a question of material fact whether Plaintiffs intended to be bound by the terms of the October 27, 2006 Document. Thus, Defendant has failed to show that, as a matter of law, either party intended the October 27, 2006 Document to be a valid and legally binding amendment to the underlying agreements.

Second, Defendant argues that Plaintiffs' actions after Mr. Maples signed the October 27, 2006 Document evidence Plaintiffs' intent to be bound to that document. Dkt. 60 at 6-8. "In Washington, the intent of the parties to a particular agreement may be

discovered not only from the actual language of the agreement, but also from '. . . the subsequent acts and conduct of the parties to the contract . . . .'" *Scott Galvanizing, Inc. v. Northwest EnviroServices, Inc.*, 120 Wn.2d 573, 580 (1993) (quoting *Berg v. Hudesman*, 115 Wn.2d 657, 667 (1990)). In this case, Defendant outlined various acts by Mr. Maples and Brook Maples that purported to show Plaintiffs' intent to be bound by the terms contained in the October 27, 2006 Document. *See* Dkt. 60 at 5-6. Defendant argues that "[m]ost telling is the fact that Westport made the initial $10,000 installment payment as required by the [October 27, 2006 Document]." *Id*. at 8. That payment, however, was made by Coyote Ridge Properties, LLC and the Court is uninformed as to Coyote Ridge's involvement in this matter. Moreover, Mr. Maples claims that there was no amendment to the underlying contract. *See supra*. Thus, for purposes of summary judgment, Plaintiffs are entitled to the inference that the $10,000 payment was made per the terms of the underlying Management Agreement. Defendant has failed to show that there are no questions of fact whether Plaintiffs' subsequent actions ratified the October 27, 2006 Document as an amendment to the underlying Management Agreement.

Therefore, the Court denies Defendant's Motion for Summary Judgment on the issue of whether the October 27, 2006 Document was a binding amendment to the underlying agreements.

    **b.**   **Plaintiffs' Breach of Contract Claims**

Defendant claims that it is entitled to summary judgment on Plaintiffs' breach of contract claims. Dkt. 37 at 18-21; Dkt. 60 at 8. First, Defendant argues that "the [October 27, 2006 Document] eliminates any claim [Westport] may have [under the Management Agreement]." Dkt. 60 at 9. The Court, however, denied Defendant's motion for summary judgment on the issue of whether the October 27, 2006 Document was a binding amendment to the Management Agreement. Therefore, the Court denies Defendant's motion on this issue as well.

Second, Defendant argues that Plaintiffs failed to provide Defendant with notice of default pursuant to both the Management Agreement and the Development Agreement. Dkt. 37 at 21-22; Dkt. 60 at 10-11. As previously mentioned, the court may interpret the intent of the contracting parties based on "the subsequent acts and conduct of the parties to the contract" and "the reasonableness of respective interpretations advocated by the parties." *Scott Galvanizing*, 120 Wn.2d at 580.

In this case, Defendant argues that it never received notice of default in writing, provided by personal delivery, certified mail, or overnight courier. Dkt. 37 at 22. Plaintiffs counter that the parties agreed that substantive communications would be handled either by telephone or via email. Dkt. 45 at 10; Maples Decl., ¶ 7. Plaintiffs claim that they sent at least 17 emails giving Defendant "notice of material breach." *Id*. (citing Maples Decl. Exhs. A-R). Moreover, the parties used email and telephone means of communication when engaging in amendment negotiations based on the deteriorating business relationships between the parties. *See supra*. Defendant has failed to show that it is entitled to summary judgment on this issue as a matter of law because, at the very least, there exists material issues of fact regarding the intent of the parties based on their subsequent acts and conduct. Although the weight of the evidence on the record shows that the October 27, 2006 Document terminated the agreements, Plaintiffs are entitled to the inferences that may be drawn in their favor based on the submitted declarations that seemingly conflict with their actions after October 2007. Further, Plaintiffs' interpretation of the notice provision is not unreasonable in light of Defendant sending not only the October 27, 2006 Document to Plaintiffs via email but also the subsequent "legal amendment" on October 30, 2006 via email. Therefore, the Court denies Defendant's motion for summary judgment on the issue of whether Plaintiffs failed to provide adequate notice to Defendant pursuant to the Management Agreement or the Development Agreement.

Finally, Defendant requests that the Court dismiss Lanco's claim for breach of contract because "Lanco waived [Defendant's] performance of [the Development Agreement]." Dkt. 37 at 22. In Washington, a party may waive the other party's required performance of a contract provision. *Panorama Residential Protective Ass'n v. Panorama Corp. of Washington*, 97 Wn.2d 23, 28 (1982). Waiver "is an intentional and voluntary relinquishment of a known right" and "can be unilateral and without consideration." *Id.*

In this case, on August 25, 2006, Brook Maples informed Defendant that Lanco wished to "[d]efer construction management on the Highlands for at least 6 months" and "engage Kemper again when we have permits in place and construction drawings ready." Davis Decl., Exh. 2 at 1. Under the Development Agreement, however, a waiver of performance must be communicated in writing pursuant to the notice provisions of the agreement. *See* Development Agreement, Art. 3.2 – Amendment and Waiver.[1] As previously mentioned, there exists a question of fact whether the parties intended email communications to be either binding upon the parties or sufficient to fulfill the notice provisions of either agreement. Therefore, the Court denies Defendant's motion for summary judgment on this issue.

---

[1] This provision is on page 22 of the Development Agreement and is located between Arts. 12.3 and 12.5. Therefore, it was most likely intended to be Art. 12.4 but is labeled as Art. 3.2.

ORDER - 14

## IV. ORDER

Therefore, it is hereby

**ORDERED** that Defendant's Motion for Summary Judgment (Dkt. 37) is **DENIED** and Plaintiffs' Cross-Motion for Summary Judgment (Dkt. 45) is **STRICKEN**.

DATED this 12th day of December, 2008.

BENJAMIN H. SETTLE
United States District Judge